IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA LEIBOLD, | ) | Case No. 1:19-cv-1078 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Cynthia Leibold seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, a period of Disability Insurance benefits ("DIB") under Title II of the Social Security Act and Widow's Insurance benefits.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11. Because the ALJ and Appeals Council failed to apply proper legal standards in evaluating whether controlling weight should have been assigned to Dr. Bell's treating source opinion, the Commissioner's final decision denying Leibold's applications for SSI and DIB is VACATED and her case is REMANDED for further consideration consistent with this order.

## II.    Procedural History

Leibold applied for SSI, DIB and Widow's insurance benefits on May 14, 2015, June 10, 2015 and July 11, 2016.  (Tr. 603-617, 626-631).[1]  She alleged that she became disabled on December 1, 2014 due to depression, anxiety and blood clots  (Tr. 612, 615).  The Social Security Administration denied Leibold's applications initially and upon reconsideration.  (Tr. 491-499, 501-507).  Leibold requested an administrative hearing.  (Tr. 509).  ALJ Joseph Rose heard Leibold's case on June 15, 2017 (Tr. 416-432) and denied the claim in an August 15, 2018, decision.  (Tr. 13-36).  Leibold requested further review and the Appeals Council granted the request for review on January 15, 2019.  (Tr. 4, 597).  On April 5, 2019, the Appeals Council upheld the ALJL decision and denied further review, rendering the Appeals Council's decision the final decision of the Commissioner.  (Tr. 1-3).  On May 14, 2019, Leibold filed a complaint seeking judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Relevant Medical Evidence

Leibold was hospitalized from May 6, 2014 through May 9, 2014 for bilateral pulmonary embolisms, worse on the right, anemia, deep vein thrombosis, and a thyroid nodule discovered during diagnostic testing.  (Tr. 714, 726).  The etiology of the pulmonary embolism was not clear.  (Tr. 719, 722).  Leibold was treated with Coumadin and instructed to follow-up regarding a thyroid nodule.  (Tr. 725-726).

Leibold saw Dr. Ann Kelleher on October 10, 2014.  Dr. Kelleher prescribed Valium for anxiety and referred Leibold to an endocrinologist for examination of her thyroid nodule.  (Tr.

---

[1] The administrative transcript is in ECF Doc. 10.

741).  Leibold saw an endocrinologist who recommended a biopsy of her nodule.  (Tr. 756).  On

January 23, 2015, Leibold underwent an endometrial ablation for metrorrhagia.  (Tr. 1106).

On June 19, 2015, Leibold was treated in the emergency room for an abscess in her groin.

While there, she complained of increased depressive symptoms and occasional suicidal ideations

without a plan.  She was diagnosed with depression and instructed on outpatient depression and

suicidal ideations.  (Tr. 730).  On June 23, 2015, Leibold reported to Dr. Kelleher that she had

left her last job because she had pulmonary embolus and it was a sedentary job.  (Tr. 761).

On October 6, 2015, Leibold underwent an initial psychological evaluation by Peter

Golden, M.D.  (Tr. 793).  She reported depressive symptoms including isolative behavior, lack of

motivation and energy, and feelings of hopelessness, helplessness, and worthlessness.  (Tr. 793).

She also reported anxiety attacks twice per month with associated chest tightness, increased heart

rate, sweating, flushing, and shortness of breath.  (Tr. 793).  On examination, Dr. Golden noted

some agitation and a depressed mood, but Leibold was attentive and her memory, insight and

judgment were good.  (Tr. 793).  Dr. Golden diagnosed major depressive disorder and anxiety

disorder and increased Leibold's dosage of Effexor.  (Tr. 793).

Leibold attended group behavioral health therapy at Southwest General Hospital from

June 21, 2016 through July 2016.  (Tr. 243-254, 231-242).  Treatment notes state that she had a

constricted, anxious and sad affect and an anxious, helpless, hopeless and sad mood.  (Tr. 245).

On November 9, 2015, Leibold followed-up with Dr. Golden.  Dr. Golden noted an

improvement in Leibold's mood.  Dr. Golden did not make any changes to her medication at that

time.  (Tr. 837).

On January 4, 2016, Leibold told Dr. Golden her symptoms were worsening.  She

complained of increased irritability, poor self-esteem, self-isolative behavior, and a greater level

of anxiety. (Tr. 831). Dr. Golden increased Leibold's dosage of Effexor. He noted that she presented as calm, cooperative, and friendly with good memory, insight and judgment. (Tr. 831-833).

On February 1, 2016, Leibold reported that she continued to feel bad with some minor improvement. She complained that she was having difficulty finding a job because "no one wants to hire a 50 year old." (Tr. 829). On May 16, 2016, Leibold reported a number of life stressors that affected her mood. Dr. Golden increased her dosage of Effexor. Her mental status exam was relatively normal. (Tr. 825-826).

On May 25, 2016, Leibold went to the Cleveland Clinic urgent care complaining of a cough. She was diagnosed with acute bronchitis. (Tr. 996-997). On June 15, 2016, she went to University Hospital's Family Clinic complaining of significantly increasing depression. (Tr. 1228).

On June 21, 2016, Melissa Gronert, RN, assessed Leibold's behavioral health. (Tr. 967-969). Leibold complained of depression and anxiety. Ms. Gronert noted a constricted affect and depressed mood. Leibold was started in the intensive outpatient program ("IOP") at Southwest General. (Tr. 978).

On July 6, 2016, Dr. Charles Luther assessed Leibold's psychiatric health. (Tr. 963). Leibold was tearful and slightly disheveled, but cooperative. Her thought process was organized and cogent. Her affect was dysphoric, tearful and constricted. (Tr. 965). Dr. Luther diagnosed major depressive disorder, comorbid with persistent depressive disorder in setting of alcohol use disorder and likely cocaine use disorder. (Tr. 965-966). She was continued in the IOP and told to follow-up with Dr. Golden. (Tr. 966). Leibold's affect was blunted and her mood was anxious and agitated in cognitive group therapy. (Tr. 952-962). When discharged from the IOP,

Leibold was assigned a GAF score of 55. Her mood was positive and futuristic and her affect was pleasant. (Tr. 943).

Leibold sought emergency care at the Southwest General Hospital emergency room on August 7, 2016. (Tr. 879). A CT of her chest revealed no pulmonary embolus, mild atelectasis of the lungs, and thickening consistent with acute or chronic bronchitis. (Tr. 8840. A CT of her abdomen and pelvis revealed fatty infiltration of the liver. (Tr. 887). She was diagnosed with acute costochondritis and pleurisy. (Tr. 887).

Leibold saw Dr. Golden on August 29, 2016 and reported that she was still depressed but was feeling better. On exam she was attentive, calm, cooperative, friendly and well-groomed. (Tr. 817). Her affect was appropriate to content, and her memory, insight and judgment were good. (Tr. 818).

Leibold saw Pamela Webster, CNP, on September 27, 2016 for left heel pain. Ms. Webster ordered an x-ray and referred Leibold to a podiatrist. (Tr. 1014). Leibold returned to Ms. Webster on January 11, 2017 with complaints of worsening left heel pain. She had not yet seen a podiatrist. Ms. Webster diagnosed chronic left heel pain and referred Leibold to a podiatrist again. (Tr. 1028). Leibold saw a podiatrist on February 5, 2017 and was diagnosed with left foot planter fasciitis. She was told to use over-the-counter orthotics. (Tr. 1035).

On January 16, 2017, Lorann Murphy, MSN, saw Leibold and noted a depressed mood and constricted affect. Her insight and judgment were fair and her memory remained good. Ms. Murphy adjusted Leibold's medication regimen to include Lamictal. (1200-1201). Leibold saw Ms. Murphy again on March 1, 2017. Her mood remained depressed and her affect was constricted. Otherwise her mental status examination was normal. (Tr. 1205-1207). On March 23, 2017, Leibold reported to Timothy Chirdon, D.O., that she had not noticed any improvement

with Lamictal. He adjusted her medications to include quetiapine fumarate. On April 6, 2017, Leibold reported feeling the same but stated that Seroquel was helping her sleep. She also felt calmer during the day. She was noted to be tearful with a depressed mood and affect. (Tr. 1216). On May 9, 2017, Dr. Chirdon noted that Leibold's depression was "Severe [and] currently debilitating." (Tr. 1214).

On November 1, 2017, an x-ray taken of Leibold's right elbow revealed a solitary hypertrophic spur of the coronoid process and possible early degeneration. (Tr. 408).

Leibold was admitted to the hospital from December 11-15, 2017 for vomiting, nausea and diarrhea. (Tr. 264, 268, 278, 283, 363-370). She was diagnosed with viral gastroenteritis and gastritis. (Tr. 283).

Leibold treated with Patti Rodgers, MSN, at Psych BC from July through October 2017. (Tr. 207-228). In July 2017, Leibold had a constricted affect and depressed mood. She complained of trouble sleeping, anxiety, panic attacks and suicidal ideation. (Tr. 220-221, 225). Ms. Rodgers diagnosed major depressive disorder, recurrent moderate/severe, without psychotic features. (Tr. 226, 228). On August 3, 2017, Leibold reported unchanged symptoms with irritability and anger. She was found to have an anxious/blunted affect and anxious depressed mood. (Tr. 217).

### B.    New Evidence

After the administrative hearing, Leibold submitted additional medical evidence to the Appeals Council. This evidence showed that Leibold received psychiatric treatment from Dr. Mary Woyshville from July to November 2018. (Tr. 37-67). Treatment notes showed that she had a tearful affect and dysphoric mood. She complained of panic attacks, bouts of extreme irritability, racing thoughts, poor sleep, suicidal ideation and worsening depression. (Tr. 38-41,

45, 47, 49, 51-52, 58-59, 63-66). Dr. Woyshville noted that Leibold was "severely anxious, dysphoric." She diagnosed recurrent major depressive disorder, moderate, panic disorder and generalized anxiety disorder." (Tr. 41).

### C. Relevant Opinion Evidence

#### 1. Treating Physician – Ann Kelleher, D.O.

Dr. Ann Kelleher completed a physical assessment form on June 23, 2015. (Tr. 768-769). She listed Leibold's diagnoses as pulmonary embolus, deep vein thrombosis and depression and anxiety. She opined that Leibold could stand five hours out of an eight hour day; sit one hour in an eight hour day; would need extra breaks every hour for ten to twenty minutes; could frequently lift and carry under ten pounds and occasionally ten to twenty pounds. (Tr. 768). She opined that Leibold had symptoms of such severity that they would frequently affect her ability to attend and concentrate on simple work related tasks; she would miss three or more days of work per month due to her impairments; and she had impairments consistent with her physical limitations. (Tr. 768-769).

Dr. Kelleher also completed an assessment of Leibold's mental capacity. (Tr. 770). She opined that Leibold had marked inability in eight different areas, including maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; completing a normal work week and workday without interruptions from psychologically based symptoms; performing at a consistent pace with a standard number and length of rest periods; an extreme limitation in her ability to be able to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and would be absent four or more times in an average month. Dr. Kelleher opined that Leibold retained the ability to manage her benefits in her own best interest. (Tr. 770-772).

## 2.        Treating Physician - Dr. Stephen Bell

Dr. Stephen Bell treated Leibold from January 2016 through November 2018.  (Tr. 68-204).  On December 21, 2016, Dr. Bell completed a mental capacity assessment form. (Tr. 1249-1251).   He opined that she had five marked limitations in her abilities to: 1) maintain attention and concentration for extended periods; 2) perform activities in a schedule, maintain regular attendance, and be punctual with customary tolerances; 3) perform at a consistent pace with a standard number of length and rest breaks; 4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and 5) respond appropriately to changes in the work setting.  (Tr 1249-1251).  Dr. Bell opined that Leibold would miss three or more days a month due to her symptoms.  (Tr. 1250).  He noted that Leibold's substance abuse had very little impact on his opinions.  (Tr. 1251).

Dr. Bell completed another medical source statement in February 2018 after the ALJ issued his decision.  He opined that Leibold had marked limitations in the areas of: 1) keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; 2) working at an appropriate and consistent pace; 3) ignoring and avoiding distractions while working; working a full day without needing more than the allotted number or length of rest periods during the day; and 4) setting realistic goals.  (Tr. 205-206).  Dr. Bell opined that Leibold had extreme limitations in the areas of: 1) completing tasks in a timely manner; 2) sustaining an ordinary routine and regular attendance at work; and 3) managing her psychologically based symptoms.  (Tr. 206).  Dr. Bell listed Leibold's diagnoses as major depressive disorder, moderate/severe.  (Tr. 206).  He stated that Leibold was easily agitated/annoyed, had a low frustration tolerance, periods of insomnia/hypersomnia, loss of interests in people and activities, difficulty concentrating periodically throughout the day, lethargy and fatigue.  (Tr. 206).  He also

stated that she could function throughout the day but only in an intermittent fashion as evidenced by her inability to consistently complete household chores and occasional missed appointments. (Tr. 206).

### 3.  State Agency Consultants

State agency reviewing psychological consultants, Jason Gunter, Ph.D., and Juliette Savitscus, Ph.D., opined that Leibold retained the ability to perform one to four step tasks with no production quotas, where social interaction was superficial, and where her duties were routine and predictable.  (Tr. 445-446, 461-462).

### 4.  Examining Physicians

On August 22, 2015, Dr. Patrick Marinello examined Leibold at the request of the agency.  (Tr. 774-778).  Leibold reported that she was disabled due to depression and anxiety. She also complained of lack of motivation, crying spells, excessive sleeping, difficulty managing her anger, rapid heart rate and shaking.  (Tr. 774).  On examination, Dr. Marinello noted that Leibold's lungs were clear, she had a symmetric, steady gait and did not use an assistive device. (Tr. 776).  Her sensory examination was normal.  She had decreased internal rotation of her left shoulder from a previous surgery, but could lift, carry and handle objects.  (Tr. 777).  Dr. Marinello opined that Leibold would have some visual and communicative limitations due to bilateral decreased visual acuity and depression.  However, he noted Leibold had "a relatively benign exam only significant for decreased external rotation of her left shoulder, this from a previous surgery, but other than that is completely normal."  (Tr. 778).  Dr. Marinello found no functional limitations for sitting, standing, walking, lifting, carrying, postural activities, or manipulative abilities.  (Tr. 778).  X-rays of Leibold's lumbar spine were normal.  (Tr. 779).

On October 12, 2015, Dr. Charles Misja conducted a psychological examination.  Leibold reported having mild to moderate panic attacks a couple times a week.  Leibold drove herself to the interview and arrived on time.  (Tr. 788).  She had adequate grooming, was friendly and cooperative and made good eye contact.  (Tr. 788).  Her mood was depressed; her affect was blunted; and she described suicidal thoughts without a plan.  (Tr. 788).  She appeared to function within the average range of intelligence.  Her insight was good but her judgment was poor to fair.  (tr. 789-790).  Dr. Misja diagnosed Major Depression, Recurrent, Severe and assigned a global assessment of functioning ("GAF") of 45.  (Tr. 790).  Dr. Misja noted that Leibold's depression was profound; that she was sabotaging her support system by isolating; and that she needed counseling.  (Tr. 790).  He opined that she would have minimal issues maintaining tasks; mild to intermediate limitations in her ability to respond appropriately to supervision and co-workers in a work setting; and intermediate to severe limitations in her ability to respond appropriately to work pressure in a work setting.  (Tr. 791).

### D.      Relevant Testimonial Evidence

Leibold testified at the ALJ hearing.  (Tr. 419-427).  She lived alone.  She had previously worked as an administrative assistant and as a call dispatcher.  (Tr. 420-421).  She felt she could no longer do any of her previous jobs because she had no motivation; she could not focus; and her mind was constantly racing and worried. (Tr. 422).  She also felt that she should not be sitting all day due to her history with blood clots.  (Tr. 423).  Leibold slept around 15 hours per day.  She had crying spells every day and panic attacks every other day.  (Tr. 425-426).

Vocational Expert ("VE") Ms. Harris[2] also testified at the hearing.  (Tr. 427-431).  The ALJ asked Ms. Harris to consider a hypothetical individual with the same age, education and

[2] Oddly, neither the ALJ nor the administrative employee who recorded the hearing noted the first name of the vocational expert, Ms. Harris.

work experience as Ms. Leibold who was limited to performing simple tasks and following simple instructions. The individual could only superficially interact with others; have few, if any, workplace changes; and no fast production quotas. (Tr. 430). The VE testified that this hypothetical individual could not perform Leibold's previous jobs, but could perform jobs such as a laundry worker, furniture assembler and machine feeder. (Tr. 430). However, she would not be able to perform any of these jobs if she was off task more than 20% of the workday and/or missed two or more workdays per month. (Tr. 430).

## IV. The ALJ and AC Decisions

The ALJ and AC made the following paraphrased findings[3] relevant to this appeal:

2. Leibold had the severe impairments of major depressive disorder and generalized anxiety disorder but had no impairment or combination of impairments which is listed in or medically equaled a Listed Impairment of 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 6, 22).

7./3. Leibold had the residual functional capacity to perform a full range of work at all exertional levels but was limited to performing simple tasks and following simple instructions; only superficial interaction with others; few, if any, workplace changes; and a work environment with no fast pace production quotas. (Tr. 25).

12./8. Considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Leibold could perform. (Tr. 30).

Based on all these findings, the ALJ determined that Leibold was not under a disability from December 1, 2014 through the date of his decision. (Tr. 31). And the Appeals Council adopted and upheld these findings. (Tr. 6-7).

---

[3] The court refers to the ALJ and AC findings using the numbers assigned by each as follows: ALJ#/AC#.

### V.   Law & Analysis

#### A.   Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.

Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

decisions of administrative agencies for harmless error.").  Furthermore, the court will not

uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.

Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a

reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, he can perform other work found in the national

economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc.*

*Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.        Non Severe Physical Impairments and Exertional Limitations

Leibold argues that the ALJ erred in failing to recognize her history of deep vein thrombosis and bilateral pulmonary embolism as a severe impairment.  At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  A "severe impairment" is a medically determinable impairment that: (1) has more than a minimal effect on an individual's ability to perform physical or mental work; and (2) is "expected to result in death [or] to last for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509, 404.1522, 416.909, 416.922; *see Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))).  If the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  The ALJ considered Leibold's bilateral pulmonary embolism at Step Two but found that it would have such a minimal effect that it would not be expected to interfere with her ability to work.  He stated:

The claimant was assessed with bilateral pulmonary embolism on May 6, 2014 after presenting to the emergency department with complaints of chest pain. (1F/7-19). Therefore, the record indicates the claimant treated with coumadin (2F/15). As of June 23, 2015, the claimant was noted to be doing well with treatment, and records from her anticoagulation follow-ups noted no related complications (2F/30-32, 7F). Notably an August 7, 2016 chest CT scan showed no sign of pulmonary embolus. (9F/31-45).

(Tr. 22).

Leibold argues that the ALJ should have considered Dr. Kelleher's opinion that Leibold could only stand five out of eight hours and sit for one hour in an eight hour workday when considering her pulmonary embolus at other steps in the sequential evaluation. ECF Doc. 15 at 13. For example, at Step Four, the ALJ found that Leibold had the residual functional capacity to perform a full range of work at all exertional levels. (Tr. 25). He did not include any limitation for sitting, despite Dr. Kelleher's opinion that Leibold should only sit for an hour at a time before taking a break. (Tr. 768).

"After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Here, the ALJ had a basis for concluding that Leibold's pulmonary embolism was not severe. He referred to diagnostic testing and noted that Leibold had no related complications when she met with Dr. Kelleher on June 23, 2015.

The ALJ was not required to find that Leibold's history of pulmonary embolisms was a severe impairment, but he *was* required to consider this condition at later steps in the sequential

analysis.  And he did.    At Step Two, the ALJ considered Leibold's pulmonary embolism diagnosis but found that this condition had been treated with coumadin, that she had no related complications, and that later scans showed no sign of pulmonary embolus.  (Tr. 22).  At Step Four, the ALJ stated that he considered all of Leibold's symptoms and the combined effects of her medically determinable impairments.  (Tr. 25).  In reviewing the medical evidence, the ALJ specifically stated that Dr. Kelleher had opined that Leibold could sit no more than one hour. (Tr. 26).  Thus, even if the ALJ erred in finding that Leibold's history of pulmonary embolisms was not severe, it was only harmless error because the ALJ considered this condition at other steps of the sequential evaluation.

### C.    Treating Physician Rule[4]

Leibold argues that the ALJ and Appeals Council failed to follow the treating physician rule by not assigning controlling weight to the opinions of Dr. Kelleher and Dr. Bell and by failing to provide good reasons for the limited weight they assigned.  At Step Four, the Commissioner must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ and AC must give a treating physician's opinion controlling weight, unless the they articulate good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record.  *See Biestek*, 880 F.3d at 786 ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by

---

[4] 20 CFR §§ 416.927 applies to Leibold's claim because it was filed before March 27, 2017.

clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (stating that good reasons include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. §§ 404.1527(c) and 416.927(c) require the ALJ to articulate good reasons for the ultimate weight given to a medical

opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'"  (citing *Rogers*, 486 F.3d at 243)).

### 1. Dr. Kelleher

After summarizing Dr. Kelleher's assessment of Leibold's impairments (Tr. 26), the ALJ assigned limited weight to her opinion, stating:

> The undersigned affords limited weight to the assessment of Dr. Kelleher.  As discussed previously, the evidence related to the claimant's physical impairments supports that claimant's physical impairments were successfully treated and/or caused no associated physical limitations.  Notably, examination findings from her consultative physical examination were benign aside from some reduction in the range of motion of her left shoulder (4F).  Later treatment notes do not support a worsening of her associated signs or symptoms.  Additionally, while psychological functional limitations are warranted, the evidence does not support the level of limitation alleged.  For example, Dr. Kelleher noted the claimant had marked limitations for maintaining attention and concentration and an extreme limitation for performing activities within a schedule.  However, clinical findings indicate she was attentive and had no difficulties with her memory (4F, 6F/2, 8F/15-17, 8F/29-30, 8F/37-41, 9F/120-123).  Further, there is no indication she was unable to attend scheduled doctor appointments or that she did not take medication as prescribed.  Finally, the claimant reported she was able to volunteer serving dinners at the Moose Lodge once a week.  (5E).

(Tr. 28-29).

The ALJ was required to give controlling weight to Dr. Kelleher's opinion if it was supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record.  Leibold was hospitalized for three days in May 2014 for bilateral pulmonary embolisms.  (Tr. 724).  This might explain Dr. Kelleher's opinion that Leibold should avoid prolonged sitting.  However, a CT scan from August 16, 2016 showed no

pulmonary embolus after more than a year of treatment with the blood thinner Coumadin. Any limitations that Leibold may have had in the immediate aftermath of her hospitalization appear to have been resolved with the administration of the medication. Further, a review of the medical evidence of record fails to reveal a single instance when a practitioner who treated Leibold for her pulmonary embolisms instructed her in the clinical setting to be cautious about the amount of time she sat. Only Dr. Kelleher's June 23, 2015 physical assessment form placed such a limitation. And that form was ambiguous because it listed four diagnoses: pulmonary embolus, DVT, depression and anxiety yet never differentiated as to which limitations she would have placed on Leibold related to which diagnosed conditions. In short, by the time it was given, Dr. Kelleher's June 2015 opinion regarding a sitting limitation – *if* it was related to pulmonary embolisms and DVTs – was no longer supported by any objective medical record, which the ALJ properly noted in his decision. (Tr. 22).

Further, Dr. Kelleher's opinion regarding a sitting limitation was inconsistent with more recent evidence in the record. For example, the ALJ noted that Leibold's "examination findings from her consultative physical examination were benign…" Dr. Marinello, the consultative examiner, stated that Leibold could "be expected to sit, stand, and walk normally in an eight hour workday with normal breaks." Leibold told Dr. Marinello that she could not sit longer than two to three minutes, but Dr. Marinello did not observe any medical reason for such a strict limitation. Sitting for only two to three minutes at a time was an even more severe restriction than suggested by Dr. Kelleher's opinion. And, Leibold told Dr. Marinello that she was disabled due to "depression and anxiety," not because of her prior diagnosis of pulmonary embolisms. (Tr. 774). Dr. Marinello cannot be faulted for ignoring such an extreme reported limitation. His examination showed no medical evidence requiring Leibold to be limited in her sitting time.

The ALJ also stated that "later treatment notes do not support a worsening of her associated signs or symptoms." In fact, later evidence showed that this condition may have completely resolved. As stated above, CT scans from August 2016 showed "no pulmonary embolus." (Tr. 875). Thus, Dr. Kelleher's opinion that Leibold was limited to one hour of sitting was no longer supported by the objective medical evidence.

The ALJ properly rejected Dr. Kelleher's opinion that Leibold could not sit for more than one hour. He noted that it was inconsistent with more recent medical evidence showing that Leibold's pulmonary embolus had resolved. (Tr. 875). The ALJ stated good reasons for assigning less than controlling weight to Dr. Kelleher's opinion. Because substantial evidence supported the ALJ's decision to assign less than controlling weight to Dr. Kelleher's opinion and because he applied proper legal standards by providing good reasons for his decision, I do not recommend remand of the ALJ's decision on this basis.

### 2. Dr. Bell's Mental Capacity Assessment

Leibold also argues that the ALJ and Appeals Council erred in the weight assigned to Dr. Bell's opinion. Dr. Bell opined that Leibold would have several marked limitations and extreme limitations in her ability to complete a normal work week without interruptions and her ability to maintain socially appropriate behavior. (Tr. 1249-1250). The ALJ entirely overlooked Dr. Bell's opinion in his decision. The Appeals Council attempted to cure the error by considering Dr. Bell's opinion and assigning little weight to it. The Appeals Council stated:

> The Appeals Council gives the opinion little weight. Specifically, the degree of limitations reported by Dr. Bell in various areas of mental function are not supported by objective medical evidence of record. The medical record documents longstanding control of depressive and anxiety symptoms with conservative treatments of psychotropic medications. The claimant consistently met with treating mental health professionals whose records document fairly unremarkable mental status examination findings including, appropriate mood and affect, friendly and cooperative response, and good insight and judgment.

Although the claimant demonstrated occasional instances of worsening symptoms, none of these episodes resulted in hospitalizations or unscheduled office visits. The treatment notes document reports of increased life stressors contemporaneous with these episodes. Moreover, treatment records document improvement and stabilization of symptoms shortly after modifications to claimant's medication regimen. (Exhibits 2F; 5F; 6F; 8F; 9F; 12F; 13F). The claimant's mental state and sustained positive response to conservative treatments, as documented throughout the record, does not corroborate Dr. Bell's opinion that she would have significant struggles in the areas of maintaining attention and concentration, sustaining work activity, responding to stress, and engage in socially appropriate behavior. (Tr. 5-6).

The regulations that governed Leibold's claims required the Commissioner to assign controlling weight to treating source opinions unless they were not supported by medical evidence or inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). With a broad brush, the Appeals Commission characterized Leibold's record as showing "longstanding control of depressive and anxiety symptoms with conservative treatments of psychotropic medications." This may not be a completely unfair characterization of the record. However, Dr. Bell's opinions *were* supported by medical evidence and were consistent with one another. As Leibold has argued, Dr. Bell's records documented symptoms of depression, anxiety, increased/decreased appetite, depressed mood, easy distraction, being distraught, engaging in risky behaviors, excessive sleeping/hypersomnia, nightmares, lucid dreams, loss of interest, hopelessness, feelings of worthlessness, depressive thoughts, excessive fear and worry, suicidal ideation, crying, social withdrawal, anxious/frustrated/intense/angry affect, and anxious/depressed/euthymic mood. (Tr. 74, 83, 89, 107, 111, 127, 129-130, 134, 140, 142, 144-145, 152, 160-161, 167-168, 175, 185, 189, 191, 193, 195, 197, 199, 201-203). An ALJ and AC *must* give a treating physician's opinion controlling weight, unless the they articulate good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight

include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; (2) inconsistency with or contradictory findings in the treating source's own records; and (3) inconsistency with other substantial evidence in the case record.  *See Biestek*, 880 F.3d at 786 (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376; Thus, even if the Appeals Council's broad characterization of the evidence may have been fair, it did not cite evidence *contradicting* Dr. Bell's opinion when they assigned less than controlling weight to his opinion.

Nor did the Appeals Council discuss the other criteria the Commissioner is required to consider when weighing a treating source opinion.  The AC made no mention of the length and frequency with which Dr. Bell treated Leibold, his area of specialization, or the other opinion evidence supporting his opinion.  Moreover, Dr. Bell's opinion was consistent with the opinions of Dr. Kelleher, Dr. Golden and Dr. Chirdon.  (Tr. 792-796, 803-843, 1214, 1250-1251).  Even the examining psychologist, Dr. Misja, diagnosed severe depression and noted that Leibold's depression was "profound" and that she needed counseling.  (Tr. 790).  The fact that Leibold's depression was treated conservatively and without hospitalization did not necessarily equate to her being able to sustain employment.  Indeed, common sense suggests that *all* mental health conditions are treated conservatively – such as through medication or psychotherapy – absent a severe episode of decompensation.  Dr. Bell's opinion was entitled to controlling weight unless it was inconsistent with substantial evidence in the record.  The ALJ and Appeals Council failed to provide good reasons for rejecting Dr. Bell's opinion.  Because they failed to follow the proper legal standards in assigning little weight to Dr. Bell's opinion, the Appeals Council's decision must be remanded for further consideration consistent with this opinion.

### D.    New Evidence

Finally, Leibold argues that new and material evidence supports a finding of disability.

Sentence six of 42 U.S.C. § 405(g) provides:

> The Court may...remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...

42. U.S.C. § 405(g). The Sixth Circuit further defined the requirements that elements be "new," "material," and that the plaintiff show "good cause" as follows:

> For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' ... Such evidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' ... A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.... [T]he burden of showing that a remand is appropriate is on the claimant.

*Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)).

The law permits this Court to remand for only two reasons - either under Sentence Six, or under Sentence Four of 42 U.S.C. § 405(g). The two types of remands are mutually exclusive. *Farlow v. Comm'r of Soc. Sec.,* No. 1:17-cv-27, 2018 U.S. Dist. LEXIS 26415 (S.D. Ohio, Feb. 20, 2018). Under Sentence Four, a court may enter "a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." *Walton v. Astrue*, 773 F. Supp. 2d 742, 746 (N.D. Ohio 2011)(internal citation omitted). Unlike a remand under Sentence Six, in a Sentence Four remand, this Court would enter final judgment and not retain jurisdiction.

Leibold submitted new evidence, but it is questionable whether it is material because it shows similar findings to other evidence already reviewed by the ALJ. However, in view of the

court's recommendation to remand this matter pursuant to Sentence Four of 42 U.S.C. § 405(g), there is no need to reach the alternative argument that Leibold is entitled to a Sentence Six remand based on the new evidence. This court cannot consider the new evidence under Sentence Four. *See Cline v. Commissioner of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996). By contrast, the ALJ may properly consider the same evidence, as well as any other new evidence, after a remand under Sentence Four. *See Sullivan v. Finkelstein,* 496 U.S. 617, 625-26, 110 S.Ct. 2658, 2664, 110 L. Ed. 2d 563 (1990); *Faucher v. Sec'y of Health and Human Servs.,* 17 F.3d 171, 173-175 (6th Cir. 1994).

## VI.    Conclusion

Because the ALJ failed to apply proper legal standards in evaluating whether controlling weight should have been assigned to Dr. Bell's opinion, the Commissioner's final decision denying Leibold's applications for DIB and SSI is VACATED and the case is REMANDED for further consideration consistent with this order.

Dated: April 6, 2020

Thomas M. Parker
United States Magistrate Judge

_____